**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| K.R., on behalf of himself and all others similarly situated,<br>Plaintiff,<br>v.<br>1400 23RD LLC, JET CITY GEAR LLC and JET CITY RETAIL, INC.,<br>Defendants. | Case No. 2:25-cv-02211-TL<br>**AMENDED CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiff K.R., individually and on behalf of all similarly situated persons, allege the following against 1400 23RD LLC, JET CITY GEAR LLC, and JET CITY RETAIL, INC. ("Defendants") based upon personal knowledge with respect to himself and on information and belief derived from, among other things, investigation by his counsel and review of public documents as to all other matters:

## I. INTRODUCTION

1. Information concerning an individual's health is among the most sensitive, and closely guarded information in our society. The unwanted disclosure of such information can be enormously harmful. It can result in discrimination in the workplace, and denial of insurance coverage. And, if people are unable to believe that their Sensitive Information will be kept confidential, they are much

less likely to seek medical care when they need it most.

2. This sensitivity is particularly acute with regards to health information relating to medical marijuana. Indeed, surveys routinely show that medical marijuana patients experience stigma and feelings of shame, and make efforts to hide their medical marijuana usage from friends and loved ones.[1]

3. Unfortunately, unbeknownst to Plaintiff and other visitors to Defendants' website, their private personal and health information was not actually being kept private. Instead, Defendants collected and transmitted personally identifiable, Sensitive Information pertaining to its customers, including the fact that they have made a medical appointment to receive a medical marijuana card; have purchased medical and/or recreational marijuana; and the specific cannabis products that they have purchased (collectively, "Sensitive Information"), to unauthorized third parties, including Alphabet, Inc. ("Google"), through the use of surreptitious online tracking tools.

4. Online advertising giants, like Google, compile as much information as possible about American consumers, including information relating to the most private aspects of their lives. This information is then used to fuel for a massive, targeted advertising enterprise.

5. Thus, any information about a person captured by these online behemoths can be used to stream ads to that person, among other uses. If Google receives information that a person is a consumer of medical marijuana, it will collect that information and allow its clients to use that information to stream ads related to related healthcare and cannabis products.

---

[1] *See* Olivia Cordingley, Elizabeth Salerno Valdez, Samantha Pagán, Emily Lincoln, Janna Ataiants & Stephen Lankenau, *Multi-level Stigma as a Barrier to Accessing Medical Cannabis for Parents in Pennsylvania*, APHA 2025 ANNUAL MEETING AND EXPO (2025), *available online at*: https://apha.confex.com/apha/2025/meetingapp.cgi/Paper/568079; *see also* Travis D Satterlund, Juliet P Lee & Roland S Moore, *Stigma Among California's Medical Marijuana Patients*, J. Psychoactive Drugs (2015), *available online at: https://pmc.ncbi.nlm.nih.gov/articles/ PMC4341951/.*

6. Google offers its clients' website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense and Google Tag Manager (collectively, the "Business Tools"). Armed with these Business Tools, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

7. But, in exchange for access to these Business Tools, website operators install Google's surveillance software on their website (the "Tracking Tools"), including 'tracking pixels' ("Pixels") and third-party 'cookies' that capture sensitive, personally identifiable information provided to the website operator by its website users. This sensitive information can include a unique identifier that Google uses to identify that user, regardless of what computer or phone is used to access the website. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

8. In essence, when website operators use Google's Business Tools, they choose to participate in Google's mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their website user's privacy.

9. Defendants is one of the companies that have chosen to prioritize its marketing efforts and profits over its customers' privacy by installing Google's Tracking Tools on its websites.

10. Defendants operate Uncle Ike's, a cannabis retailer in the State of Washington." Through Defendants' website, www.ikes.com (the "Website"), visitors can order its cannabis products for pick-up at one of its multiple storefronts.[2] Defendants also partner with medical doctors

[2] *Menu*, UNCLE IKE'S, https://ikes.com/menu/ (last accessed Nov. 5, 2025).

specializing in medical marijuana, and Website visitors can schedule an appointment with these doctors for the purpose of obtaining a medical marijuana card directly through the Website.[3]

11. Plaintiff and Class Members used the Website and had their personal Sensitive Information tracked by Defendants using the Tracking Tools. However, Defendants ***never*** obtained authorization from Plaintiff or Class Members to share their Sensitive Information with third parties. At all times relevant to this action, Plaintiff and Class Members gave no informed consent for information about their Sensitive Information to be transmitted to the third parties, including the largest advertiser and compiler of user information.

12. Health information, including information related to medical cannabis treatment, is highly regulated by Washington law, including through the Washington Cannabis Patient Protection Act ("CPPA"), Wash. Rev. Code Ann. § 69.69.51, *et seq.*, and the Washington My Health My Data Act ("MHMDA"), Wash. Rev. Code Ann. § 19.373.005, *et seq.*, both of which prohibit the disclosure of medical marijuana-related health information without explicit, informed consent. Accordingly, Defendants' disclosure of Plaintiff's and Class Members' Sensitive Information constitutes a violation of Washington law.

13. As a result of Defendants' conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of medical privacy; (ii) lack of trust in communicating with medical providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Information; (vi) statutory damages and (vii) continued and ongoing risk to their Sensitive Information.

---

[3] *Washington Medical Cannabis Compliance*, UNCLE IKE'S, https://ikes.com/washington-medical-cannabis-compliance/ (last accessed July 29, 2025).

14. Therefore, Plaintiff seeks, on behalf of himself and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Defendant: Invasion of Privacy – Intrusion Upon Seclusion; Breach of Fiduciary Duty; Negligence; Breach of Implied Contract; Unjust Enrichment; violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq*.; and violations of the Washington Consumer Protection Act.

## II. PARTIES

***Plaintiff K.R.***

15. Plaintiff K.R. is a citizen of the State of Washington, residing in King County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

16. In or around January of 2025, Plaintiff K.R. utilized the Website on his personal electronic device to schedule an appointment with Defendants to receive a medical marijuana card. After receiving his medical marijuana card, Plaintiff K.R. subsequently utilized the Website to purchase medical marijuana on several occasions.

17. Unbeknownst to Plaintiff K.R., the Website transmitted the Sensitive Information that she input into his appointment to unauthorized third parties.

18. Plaintiff K.R. never authorized Defendants to disclose any aspect of his communications with Defendants through the Website to third parties, including the Sensitive Information that he provided through the Website.

19. On every occasion that he visited the Website, Plaintiff K.R. possessed an account with Google, and he accessed the Website while logged into her Google account on the same device.

***Defendant 1400 23rd LLC***

20. Defendant ***1400 23rd LLC***. is a limited liability corporation incorporated in the State of Washington with its principal place of business at 2314 E Union Street, Seattle, WA, in King County.

/ / /

***Defendant Jet City Gear LLC***

21. Defendant Jet City Gear LLC is a limited liability corporation incorporated in the State of Washington with its principal place of business at 2314 E Union Street, Seattle, WA, in King County.

***Defendant Jet City Retail, Inc.***

22. Defendant Jet City Retail, Inc. is a for-profit corporation incorporated in the State of Washington with its principal place of business at 2314 E Union Street, Seattle, WA, in King County.

## III. JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiffs and many putative class members are citizens of a different state than Defendants. Additionally, this Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

24. This Court has personal jurisdiction over Defendants because Defendants has are headquartered in this judicial district and sold their marijuana products in this District, including to Plaintiff K.R.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action occurred in this judicial district.

/ / /

/ / /

/ / /

/ / /

## IV. FACTUAL ALLEGATIONS

### A. DEFENDANTS' USE OF THIRD-PARTY TRACKING TECHNOLOGIES

#### i. Google's Mass Advertising Surveillance Operation

25. Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[4] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[5]

26. Google advertises Google Analytics and other Business Tools to website operators, like Defendants, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[6] But, in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[7]

27. Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third party websites, stating that "[m]any websites and apps use Google services to improve their

---

[4] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted20 for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Mar. 7, 2025).

[5] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last accessed Mar. 7, 2025).

[6] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last accessed Mar. 7, 2025).

[7] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last accessed Mar. 7, 2025).

content and keep it free. When they integrate our services, these sites and apps share information with Google."[8]

28. Google also admits that it uses the information collected from third party websites, such as the Website, to sell targeted advertising, explaining to users that, "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[9]

29. While Google admits that it collects information from third-party websites through the Tracking Tools, it does not provide, nor could it provide, a publicly available list of every webpage on which its Tracking Tools are installed. As such, the vague descriptions of Google's data collection practices referenced above could not give Plaintiffs and Class Members any reason to think that Defendants were part of Google's surveillance network. Moreover, as Defendants does not disclose their use of Google's Tracking Tools, Plaintiffs and Class Members could not have been reasonably expected to review any of Google's privacy statements in connection with their use of the Website.

30. Google aggregates the user information that it collects from third-party websites into 'advertising profiles' consisting of all of the data that it has collected about a given user.[10] With these advertising profiles, Google can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership

---

[8] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last accessed Mar. 7, 2025).

[9] *Id.*

[10] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

status, marital status, household income, type of employment, use of specific apps or websites, and more.[11]

31. Google's surveillance of individual's internet usage is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google,"[12] and Google trackers are present on 74-percent of all web traffic.

32. Moreover, as in this case, the data collected by Google often pertains to the most personal and sensitive aspects of an individual's life. For example:

a. 93-percent of pornography websites allow third parties, including Google, to collect their user's browsing habits.[13] In fact, Google advertising trackers were found on 73-percent of pornography websites.[14]

b. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[15]

c. Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal

---

[11] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last accessed Mar. 7, 2025).

[12] Narseo Vallina-Rodriguez & Srikanth Sundaresan, *7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Mar. 7, 2025).

[13] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.

[14] *Id.*

[15] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

vitamins, and Plan B to online advertisers.[16] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google.[17]

33. This monumental, invasive surveillance of Americans' internet usage and resulting violation of their privacy is not accidental. As Google's then-CEO, Eric Schmit, admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[18]

34. In fact, Google values user information so highly that it provides its Business Tools to many website operators for free, all to expand its surveillance apparatus.[19]

35. When website operators, like Defendants, make use of Google's Business Tools, they are essentially choosing to participate in Google's mass surveillance network and, in return, they benefit from Google's collection of user data at the expense of their website users' privacy. For example, Google rewards website operators for providing it with user information by granting such website operators access to its Analytics platform, which then leverages demographic data collected by Google to provide detailed analyses of the website's user base.[20]

---

[16] Darius Tahir & Simon Fondrie-Teitler, *Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last accessed Mar. 7, 2025).

[17] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last accessed Mar. 7, 2025).

[18] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last accessed Mar. 7, 2025).

[19] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last accessed Mar. 7, 2025) ("Google Analytics gives you the tools, free of charge"),

[20] *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last accessed Mar. 7, 2025).

36. Unfortunately, it is usually the case that a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[21] And even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[22]

37. Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours – or 30.5 working days – to read the privacy policy of every new website that they visited in a single year.[23]

**ii. Pixels Can Record Almost Every Interaction Between a User and a Website**

38. In order to use Google's Business Tools, Defendants installed Google's Tracking Tools, including tracking Pixels, onto the Website.

39. Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by

---

[21] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[22] *Id.*

[23] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[24]

40. Pixels can collect a shocking amount of information regarding an individual's online behavior—including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the buttons and hyperlinks that the user clicks while using a website, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form—all transmitted in real-time as the user navigates a website.[25]

41. But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[26]

---

[24] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last accessed Mar. 7, 2025).

[25] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last accessed Mar. 7, 2025); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last accessed Mar. 7, 2025).

[26] *Lurking Beneath the Surface, supra* note 24.

**iii. The Pixels Installed on the Website Transmit Personally Identifiable Information and Protected Health Information to Google**

42. Every website is hosted by a computer "server" that holds the website's contents.

43. To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

44. Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

45. Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[27] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[28] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[29]

---

[27] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Mar. 7, 2025).

[28] *Id.*

[29] *Id.*

46. When a Google user logs onto their account, their web browser records a Google tracking cookie.[30] This cookie includes a specific line of code that links the web browser to the user's Google account.[31]

47. Google's Pixels use cookies but operate differently than a cookie. Rather than directing the browser to save a file on the user's device, the Pixels acquire information from the browser without notifying the user. The information can include details about the user, his or her interactions with the website, and information about the user's environment (*e.g.,* type of device, type of browser, and sometimes even the physical location of the device), all relayed contemporaneously as the website user navigates the website.

48. Simultaneously, the Google Pixels, like those installed on the Website, request identifying information from any Google cookies previously installed on the user's web browser.

49. The Pixels then combine the data received from the browser with the data acquired from the cookie, and instructs the web browser to transmit the information back to Google. As a result, Google can link all of the user information collected by their Pixels to the user's identity, via the user's Google profile. Thus, even if a user never actually logs into a website or fills out a form, the website, along with Google, can know the user's identity.

50. A remarkable number of Americans possess a Google account. Just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans.[32] When these users visit a website, like those on which the Website has been installed, that utilizes a Google Pixel, any

---

[30] Cyphers, *supra* note 10.
[31] *Id.*

[32] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last accessed Mar. 7, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last accessed Mar. 7, 2025).

information collected by the Pixel can be linked to the user's identity through the Google cookies installed on the user's web browser.

51. However, it is not only Google account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google utilizes sophisticated data tracking methods to identify even those few users who do not have a Google account.

52. Google's Pixels, like those on the Website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

53. An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[33] By tracking this browser fingerprint, Google is able to compile a user's activity across the internet.[34] And, as Google continuously compiles user data over time, its understanding of the user's browser fingerprint becomes more sophisticated such that it needs only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

**iv. Defendants Disclosed Plaintiff's and Class Members' Sensitive Information to Google.**

54. To schedule a medical appointment with Defendants, Plaintiffs and Class Members were required to complete a scheduling form through the Website,

55. Unbeknownst to Plaintiff and Class Members, Defendants intentionally configured the Tracking Tools installed on the Website to capture and transmit the Sensitive Information that they communicated to Defendants while scheduling their appointments to third parties, including Google.

56. The following screenshot ("Figure 1") depicts the network transmissions made by the Google Tracking Tools installed on the Website when users of the Website schedule an appointment

[33] Cyphers, *supra* note 10.
[34] *Id.*

to receive a medical marijuana card. As Figure 1 shows, when customers schedule an appointment on the Website, the Sensitive Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Website include the fact that the customer scheduled a Washington Medical Cannabis Compliance appointment, as well as the specific Ike's location where the appointment was scheduled (in this case, the Seattle location).

57. Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Information provided by Plaintiffs to their identities. The following screenshots show that the Google Pixel on the Website transmitted the identifier numbers attached to Google's 'cid,' cookies, which identify the user's Google account, along with other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, IP address, web browser software and version number, and operating system and version number.

/

/

/

/

/

/

/

/

/

/

/

/




*Figure 1. Screenshot depicting back-end network traffic from the Website which shows information transmitted to Google when Website users schedule an appointment to receive a medical marijuana card.*

58. The Tracking Tools also record every action that Website users make while shopping for cannabis products on the Website. As the following screenshots ("Figures 2 and 3") demonstrate, the Tracking Tools transmit the specific products that Website users add to their shopping cart, as well as the products that they actually end up purchasing (in both instances here, a "Disposable Vape Blackberry Drip 1g"), alongside the identifier numbers attached to Google's 'cid,' cookies, which identify the user's Google account, along with other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, IP address, web browser software and version number, and operating system and version number.

Query String Parameters View source View URL-encoded

<table>
<tr><td>v</td><td>2</td></tr>
<tr><td>tid</td><td>G-E2YK4H50X6</td></tr>
<tr><td>gtm</td><td>45je57v0v869468570z89180486873za200zb9180486873zd9180486873</td></tr>
<tr><td>_p</td><td>1754331847879</td></tr>
<tr><td>_gaz</td><td>1</td></tr>
<tr><td>gcd</td><td>13l3l3l3l1l1</td></tr>
<tr><td>npa</td><td>0</td></tr>
<tr><td>dma</td><td>0</td></tr>
<tr><td>tag_exp</td><td>101509157~103116026~103200004~103233427~104527907~104528501~104684208~104684211~104948813~105087538~105087540~105091133~105103161~105103163</td></tr>
<tr><td>cid</td><td>507161583.1754331849</td></tr>
<tr><td>ecid</td><td>1398852535</td></tr>
<tr><td>ul</td><td>en-us</td></tr>
<tr><td>sr</td><td>1920x1080</td></tr>
<tr><td>uaa</td><td>x86</td></tr>
<tr><td>uab</td><td>64</td></tr>
<tr><td>uafvl</td><td>Not)A%3BBrand;8.0.0.0|Chromium;138.0.7204.169|Google%20Chrome;138.0.7204.169</td></tr>
<tr><td>uamb</td><td>0</td></tr>
<tr><td>uam</td><td></td></tr>
<tr><td>uap</td><td>Windows</td></tr>
<tr><td>uapv</td><td>19.0.0</td></tr>
<tr><td>uaw</td><td>0</td></tr>
<tr><td>are</td><td>1</td></tr>
<tr><td>frm</td><td>0</td></tr>
<tr><td>pscdl</td><td>noapi</td></tr>
<tr><td>_eu</td><td>AAAAAAQ</td></tr>
<tr><td>_s</td><td>13</td></tr>
<tr><td>sid</td><td>1754331848</td></tr>
<tr><td>sct</td><td>1</td></tr>
<tr><td>seg</td><td>1</td></tr>
<tr><td>dl</td><td>https://ikes.com/menu/</td></tr>
<tr><td>dr</td><td>https://ikes.com/menu/?product=147c72a1-c871-468b-b7d7-5986668a8966</td></tr>
<tr><td>dt</td><td>Cannabis Dispensary Menu in Seattle, WA - Uncle Ike's Cannabis Dispensary in Seattle, WA</td></tr>
</table>

| | |
|---|---|
| en | select_item |
| pr1 | id4af36149-adc4-4bcc-a7fa-84a311e4c851~nmDisposable Vape Blackberry Drip 1g (H) Cloud Pack~afLake City Way~brFire Bros~caVAPORIZERS~c2DISPOSABLE_VAPES~c3HYBRID~va1.0g~pr32.54~qt1~k0currency~v0USD~lifeatured~lnFeatured~lp1 |
| _et | 2015 |
| tfd | 391011 |

X Headers Payload Preview Response Initiator Timing Cookies

▾Query String Parameters View source View URL-encoded

| | |
|---|---|
| v | 2 |
| tid | G-KDHT4N6YVW |
| gtm | 45je57v0v874189380z89180486873za200zb9180486873zd9180486873 |
| _p | 1754331847879 |
| gcd | 13l3l3l3l1l1 |
| npa | 0 |
| dma | 0 |
| tag_exp | 101509157~103116026~103200004~103233427~104527907~104528500~104684208~104684211~104948813~105087538~105087540~105103161~105103163~105113531 |
| cid | 507161583.1754331849 |
| ecid | 518600440 |
| ul | en-us |
| sr | 1920x1080 |
| ir | 1 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not)A%3BBrand;8.0.0.0\|Chromium;138.0.7204.169\|Google%20Chrome;138.0.7204.169 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| are | 1 |
| frm | 0 |
| pscdl | noapi |
| ec_mode | a |
| _prs | ok |
| _eu | EAAAAAQ |
| _s | 18 |
| sid | 1754331848 |
| sct | 1 |
| seg | 1 |
| dl | https://ikes.com/menu/ |
| dr | https://ikes.com/menu/?product=4af36149-adc4-4bcc-a7fa-84a311e4c851 |
| dt | Cannabis Dispensary Menu in Seattle, WA - Uncle Ike's Cannabis Dispensary in Seattle, WA |
| en | begin_checkout |
| _c | 1 |
| pr1 | id4af36149-adc4-4bcc-a7fa-84a311e4c851~nmDisposable Vape Blackberry Drip 1g (H) Cloud Pack~afLake City Way~k0currency~v0USD~brFire Bros~caVAPORIZERS~c2DISPOSABLE_VAPES~c3HYBRID~va1.0g~pr32.54~qt1~lifeatured~lnFeatured~lp1 |
| _et | 2308 |
| tfd | 419208 |

*Figures 2 and 3. Screenshots depicting back-end network traffic from the Website which show information transmitted to Google when Website users add an item to their shopping cart and check out.*

59. Even more troublingly, the Tracking Tools specifically notify Google when users make a medical marijuana purchase. As the following screenshot ("Figure 4") shows, when a medical marijuana patient makes a purchase on the Website, the information transmitted to Google includes the fact that the user entered their medical marijuana card number, transmitted alongside the identifier numbers attached to Google's 'cid,' cookies, which identify the user's Google account, along with other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, IP address, web browser software and version number, and operating system and version number.

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

Query String Parameters View source View URL-encoded

<table>
<tr><td>v</td><td>2</td></tr>
<tr><td>tid</td><td>G-KDHT4N6YVW</td></tr>
<tr><td>gtm</td><td>45je57v0v874189380za200zb9180486873zd9180486873</td></tr>
<tr><td>_p</td><td>1754332267815</td></tr>
<tr><td>gcd</td><td>13l3l3l3l1l1</td></tr>
<tr><td>npa</td><td>0</td></tr>
<tr><td>dma</td><td>0</td></tr>
<tr><td>tag_exp</td><td>101509157~103116026~103200004~103233427~104527906~104528501~104684208~104684211~104948813~105087538~105087540~105103161~105103163</td></tr>
<tr><td>cid</td><td>507161583.1754331849</td></tr>
<tr><td>ecid</td><td>518600440</td></tr>
<tr><td>ul</td><td>en-us</td></tr>
<tr><td>sr</td><td>1920x1080</td></tr>
<tr><td>ir</td><td>1</td></tr>
<tr><td>uaa</td><td>x86</td></tr>
<tr><td>uab</td><td>64</td></tr>
<tr><td>uafvl</td><td>Not)A%3BBrand;8.0.0.0|Chromium;138.0.7204.169|Google%20Chrome;138.0.7204.169</td></tr>
<tr><td>uamb</td><td>0</td></tr>
<tr><td>uam</td><td></td></tr>
<tr><td>uap</td><td>Windows</td></tr>
<tr><td>uapv</td><td>19.0.0</td></tr>
<tr><td>uaw</td><td>0</td></tr>
<tr><td>are</td><td>1</td></tr>
<tr><td>frm</td><td>0</td></tr>
<tr><td>pscdl</td><td>noapi</td></tr>
<tr><td>_eu</td><td>EEEAAAQ</td></tr>
<tr><td>_s</td><td>2</td></tr>
<tr><td>sid</td><td>1754331848</td></tr>
<tr><td>sct</td><td>1</td></tr>
<tr><td>seg</td><td>1</td></tr>
<tr><td>dl</td><td>https://ikes.com/checkout/?checkout=71e4682e-7ec3-47b2-aa12-60b1ad83abbd</td></tr>
<tr><td>dr</td><td>https://ikes.com/menu/</td></tr>
<tr><td>dt</td><td>Checkout - Uncle Ike's Cannabis Dispensary in Seattle, WA</td></tr>
<tr><td>_tu</td><td>Cg</td></tr>
<tr><td>epn.form_length</td><td>27</td></tr>
<tr><td>ep.first_field_id</td><td>medicalCardNumber</td></tr>
<tr><td>ep.first_field_name</td><td>medicalCardNumber</td></tr>
<tr><td>ep.first_field_type</td><td>text</td></tr>
<tr><td>epn.first_field_position</td><td>9</td></tr>
<tr><td>_et</td><td>8041</td></tr>
<tr><td>tfd</td><td>15279</td></tr>
</table>

*Figure 4. Screenshot depicting back-end network traffic from the Website which shows information transmitted to Google when Website users make a medical marijuana purchase.*

60. In their default state, Google's Pixels record and transmit only "automatic events," consisting largely of routine user behavior, such as clicking a link, clicking on an advertisement, or viewing a webpage.[35] Defendants purposely configured the Google Pixels on the Website to collect and transmit additional user data, including the fact that Website users purchased specific products, scheduled medical marijuana card appointments, and entered their medical marijuana card number on the purchasing form.

### B. DEFENDANTS DISCLOSED PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT

#### i. Defendants failed to inform Plaintiffs and Class Members of its disclosure of Plaintiff's and Class Members' Sensitive Information, in violation of its Notice of Privacy Practices

61. Defendants' Privacy Policy assures their customers that they will keep their Sensitive Information private and secure and that it will only disclose Sensitive Information under certain circumstances, ***none of which is true.***[36]

62. Defendants breached Plaintiff's and Class Members' right to privacy by unlawfully disclosing their Sensitive Information to third parties, including Google. Specifically, Plaintiffs and Class Members had a reasonable expectation of privacy (based on Defendants' own representations to Plaintiffs and the Class that Defendants would not disclose their Sensitive Information to third parties). Defendants did not inform Plaintiffs that they were sharing their Sensitive Information with third parties, including Google.

63. By engaging in this improper sharing of information without Plaintiff's and Class Members' consent, Defendants violated their own Privacy Policy and breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed their Sensitive Information.

---

[35] *Automatically Collected Events*, GOOGLE ANALYTICS HELP, https://support.google.com/analytics/answer/9234069, (last visited on Mar. 25, 2025).

[36] *Privacy Policy*, UNCLE IKE'S, https://ikes.com/privacy-policy/ (last accessed Aug. 4, 2025).

64. Despite never telling users like Plaintiffs and Class Members, Defendants allowed third parties such as Google to intercept Plaintiff's and Class Members' Sensitive Information and use it for advertising purposes.

#### ii. The Tracking Tools Used by Defendants Were Imperceptible to Plaintiffs and Class Members

65. The Tracking Tools installed on the Website were invisible to Plaintiffs and Class Members. Without analyzing the network information transmitted by the Website through examination of its source code or the use of sophisticated web developer tools, there was no way for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiffs and Class Members, were unable to detect the Tracking Tools on the Website.

66. Plaintiffs and Class Members were shown no disclaimer or warning that their Sensitive Information would be disclosed to any unauthorized third party without their express consent.

67. Plaintiffs and Class Members did not know that their Sensitive Information was being collected and transmitted to an unauthorized third party.

68. Because Plaintiffs and Class Members were not aware of the Tracking Tools on the Website, or that their Sensitive Information would be collected and transmitted to Google, they could not and did not consent to Defendants' conduct.

### C. DEFENDANTS WERE ENRICHED BY THEIR DISCLOSURE OF PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES

#### i. Defendants Received Material Benefits in Exchange for Plaintiff's Sensitive Information

69. As explained, *supra*, users of Google's Business Tools, like Defendants, receive access to advertising and marketing analytics services in exchange for installing Google's Tracking Tools on its website.

70. Upon information and belief, Defendants, as users of Google's Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google to collect Plaintiff's and Class Members' Sensitive Information.

**ii. Plaintiff's and Class Members' Data Had Financial Value**

71. Moreover, Plaintiff's and Class Members' Sensitive Information has value and Defendants' disclosure and interception of that Sensitive Information harmed Plaintiffs and the Class.

72. According to the annual reports of Facebook, another major online advertising proprietor, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[37]

73. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

74. Moreover, health information is particularly valuable. Healthcare data brokers charge up to $125 per clinical data record, with electronic healthcare databases selling for up to $500,000.[38] In fact, compared to other types of personal data, healthcare data records are by far the most valuable, fetching prices of up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[39]

---

[37] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/ 08/29/facebook-privacy-monopoly/ (last visited Mar. 7, 2025).

[38] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[39] Todd Zigrang & Jessica Bailey-Wheaton, *Valuing Healthcare Data*, THE VALUE EXAMINER (2023), *available online at*: https://www.healthcapital.com/researchmaterialdocuments/ publishedarticles/ Valuing%20Healthcare%20Data.pdf

75. Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

76. The unauthorized disclosure of Plaintiff's and Class Members' private and Sensitive Information has diminished the value of that information, resulting in harm including Plaintiffs and Class Members.

### D. DEFENDANTS' USE OF THE TRACKING TOOLS VIOLATES WASHINGTON LAW

#### i. The Washington Cannabis Patient Protection Act ("CPPA") [Wash. Rev. Code Ann. § 69.69.51, *et seq.*]

77. In November of 1998, Washington voters approved Initiative I-692, the Medical Use of Marijuana Act, legalizing cannabis for medical purposes.[40] Shortly thereafter, the legislature enacted the Cannabis Patient Protection Act to regulate the nascent cannabis industry.

78. Through the CPPA, the Washington legislature included significant" privacy protections…in terms of limiting access to patient information," including "strict penalties" for misuse of such information. *Carter v. Inslee*, No. C16-0809-JCC, 2016 U.S. Dist. LEXIS 189718, at *13 (W.D. Wash. June 30, 2016).

79. Specifically, the CPPA creates a confidential medical cannabis authorization database that allows cannabis retailers, like Defendants, to confirm that an individual seeking medical cannabis has a valid medical marijuana card. Wash. Rev. Code Ann. § 69.51A.230(1)(e). But, "[p]ersonally identifiable information…included in the medical cannabis authorization database is confidential and exempt from public disclosure, inspection, or copying." Wash. Rev. Code Ann. § 69.51A.230(9)(a).

---

[40] *See November 1998 General Election Results*, WASHINGTON SECRETARY OF STATE, *available online at*: https://www.sos.wa.gov/elections/.

An entity that discloses such information is guilty of a class C felony. Wash. Rev. Code Ann. § 69.51A.240.

80. Therefore, by disclosing the fact that Plaintiffs and Class Members were medical marijuana card holders, Defendants violated the CPPA.

**ii. The Washington My Health My Data Act ("MHMDA") [Wash. Rev. Code Ann. § 19.373.005, *et seq.*]**

81. The Washington legislature enacted the MHMDA in 2023 to expand protections for privacy of all medical information, even that not protected under the federal Health Insurance Portability and Accountability Act ("HIPAA"). Specifically, the legislature states that:

> The legislature finds that the people of Washington regard their privacy as a fundamental right and an essential element of their individual freedom. Washington's Constitution explicitly provides the right to privacy. Fundamental privacy rights have long been and continue to be integral to protecting Washingtonians and to safeguarding our democratic republic…
>
> Information related to an individual's health conditions or attempts to obtain health care services is among the most personal and sensitive categories of data collected. Washingtonians expect that their health data is protected under laws like the health information portability and accountability act (HIPAA). However, HIPAA only covers health data collected by specific health care entities, including most health care providers. Health data collected by noncovered entities, including certain apps and websites, are not afforded the same protections. [The My Health My Data Act] works to close the gap between consumer knowledge and industry practice by providing stronger privacy protections for all Washington consumers' health data."

Wash. Rev. Code Ann. § 19.373.005.

82. The MHMDA protects against the unauthorized disclosure of "consumer health data," defined as "personal information that is linked or reasonably linkable to a consumer and that identifies the consumer's past, present, or future physical or mental health status," including a consumer's "[u]se or purchase of prescribed medication[.]" Wash. Rev. Code Ann. § 19.373.010(8).

83. Under the MHMDA, an entity may not collect any consumer health data without obtaining consent from the consumer for "such collection for a specified purpose[.]" " Wash. Rev. Code Ann. § 19.373.030(a). To comply with this requirement, the entity must maintain a "consumer health data privacy policy that clearly and conspicuously discloses" the categories and source of any consumer health data collected, as well as the identity of any third parties with which such health data is being shared. Wash. Rev. Code Ann. § 19.373.020(1)(a). The policy must also document the procedure through which the consumer may opt out of any data collection. *Id*; *see also* Wash. Rev. Code Ann. § 19.373.040 (documenting right of consumer to opt out of data collection). A violation of the MHMDA also constitutes a violation of the Washington Consumer Protection Act [Wash. Rev. Code Ann. § 19.86]. Wash. Rev. Code Ann. § 19.373.090.

84. On their Website, Defendants do not disclose their collection and disclosure of website visitors' Sensitive Information through the Tracking Tools. In fact, the Website's Privacy Policy explicitly promises users that Defendants "do not sell, trade, rent or otherwise share for marketing purposes [their] Personal Information with third parties without [their] consent."[41] The Website additionally does not provide any documentation of how website users can opt out of data collection. *Id*.

85. Accordingly, Defendants' use of the Tracking Tools violates the MHMDA.

[41] *Privacy Policy*, UNCLE IKE'S, https://ikes.com/privacy-policy/ (last accessed Aug. 4, 2025).

### E. PLAINTIFF'S AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY

86. In its Privacy Policy, Defendants assures patients that: "[e]xcept as otherwise stated in this Privacy Policy, we do not sell, trade, rent or otherwise share for marketing purposes your Personal Information with third parties without your consent." *Id*. Nowhere in the Privacy Policy do Defendants inform customers that their personally-identifiable Sensitive Information will be shared with Google. *Id*.

87. At all times when Plaintiffs and Class Members provided their Sensitive Information to Defendants, they each had a reasonable expectation that the information would remain confidential and that Defendants would not share the Sensitive Information with third parties for a commercial purpose, unrelated to providing them with cannabis products.

88. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

89. For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[42]

90. Moreover, Americans are particularly interested in the safety of their health information. Over 50-percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."[43] And, in a study performed by the National

---

[42] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Mar. 7, 2025).

[43] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

Institutes of Health ("NIH"), nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[44]

91. These feelings are particularly acute with regards to medical marijuana. Indeed, numerous studies have noted that medical marijuana patients experience "stigma at multiple socioecological levels" and "report feeling" same due to their use of medical cannabis.[45] As a result, medical marijuana patients "engage in discreet use and covert dispensary visits to avoid stigma and social exclusion."[46]

92. Personal data privacy and obtaining consent to share Sensitive Information are material to Plaintiffs and Class Members.

## V. TOLLING AND ESTOPPEL

93. Any applicable statutes of limitation have been tolled by Defendants' knowing and active concealment of the incorporation of Google's Tracking Tools onto the Website.

94. The Tracking Tools on the Website were and are invisible to the average website visitor.

95. Through no fault or lack of diligence, Plaintiffs and Class Members were deceived and could not reasonably discover Defendants' deception and unlawful conduct.

---

[44] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH SERV. RES. (2011), *available online at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

[45] Olivia Cordingley, Elizabeth Salerno Valdez, Samantha Pagán, Emily Lincoln, Janna Ataiants & Stephen Lankenau, *Multi-level Stigma as a Barrier to Accessing Medical Cannabis for Parents in Pennsylvania*, APHA 2025 ANNUAL MEETING AND EXPO (2025), *available online at*: https://apha.confex.com/apha/2025/meetingapp.cgi/Paper/568079; *see also* Travis D Satterlund, Juliet P Lee & Roland S Moore, *Stigma Among California's Medical Marijuana Patients*, J. Psychoactive Drugs (2015), *available online at: https://pmc.ncbi.nlm.nih.gov/articles/ PMC4341951/.*

[46] *Id.*

96. Plaintiffs were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

97. Defendants had exclusive knowledge that the Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to customers, including Plaintiffs and Class Members, that by scheduling appointments through the Website, Plaintiff's and Class Members' Sensitive Information would be disclosed or released to unauthorized third parties, including Google.

98. Under the circumstances, Defendants were under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers' Sensitive Information. In fact, to the present, Defendants have not conceded, acknowledged, or otherwise indicated to its customers that they have disclosed or released their Sensitive Information to unauthorized third parties. Accordingly, Defendants are estopped from relying on any statute of limitations.

99. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

100. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendants' conduct would have been shortly before the filing of this Complaint.

## VI. CLASS ALLEGATIONS

101. This action is brought by the named Plaintiffs on their behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

102. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

**<u>The Nationwide Class</u>**

All natural persons who used the Website to schedule or re-schedule an appointment, and whose Sensitive Information was disclosed or transmitted to Google or any other unauthorized third party.

103. In addition to the claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims on behalf of separate Washington Subclass, which is defined as follows:

**<u>Washington Subclass</u>**

All natural persons residing in the State of Washington who used the Website and whose Sensitive Information was disclosed or transmitted to Google, or any other unauthorized third party.

104. Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

105. Plaintiffs reserve the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

106. **<u>Numerosity.</u>** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 10,000 individuals that have been impacted by Defendants' actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendants.

107. **<u>Commonality.</u>** Common questions of law or fact arising from Defendants' conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a) Whether and to what extent Defendants had a duty to protect the Sensitive Information of Plaintiffs and Class Members;

b) Whether Defendants had duties not to disclose the Sensitive Information of Plaintiffs and Class Members to unauthorized third parties;

c) Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their Sensitive Information would be disclosed to third parties;

d) Whether Defendants violated the law by failing to promptly notify Plaintiffs and Class Members that their Sensitive Information was being disclosed without their consent;

e) Whether Defendants adequately addressed and fixed the practices which permitted the unauthorized disclosure of customers' Sensitive Information;

f) Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Information belonging to Plaintiffs and Class Members free from unauthorized disclosure;

g) Whether Defendants violated the statutes asserted as claims in this Complaint;

h) Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

i) Whether Defendants knowingly omitted material representations with respect to their data security and/or privacy policy practices; and

j) Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendants' disclosure of their Sensitive Information.

108. **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Sensitive Information, like that of every other Class Member, was compromised as a result of Defendants' incorporation and use of the Tracking Tools.

109. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiffs have no disabling conflicts of interest that would be

antagonistic to those of the other members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

110. **Predominance**. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members in that all the Plaintiff's and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including Google, in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

111. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

112. Defendants acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

113. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which

would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Information and not disclosing it to unauthorized third parties;

b) Whether Defendants breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Information;

c) Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendants adequately and accurately informed Plaintiffs and Class Members that their Sensitive Information would be disclosed to third parties;

e) Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendants' wrongful conduct.

114. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

**COUNT I**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Washington Subclass)**

115. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 114 as if fully set forth herein.

116. Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their highly personal and statutorily protected Sensitive Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration and/or unauthorized sharing of their communications without Plaintiff's and Class Members' knowledge or consent.

117. Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Defendants via the Website and the communications platforms and services therein.

118. Plaintiffs and Class Members communicated Sensitive Information that they intended for only Defendants to receive and that they understood Defendants would keep private and secure.

119. Defendants' disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiffs and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

120. Plaintiffs and Class Members had a reasonable expectation of privacy given Defendants' Notice of Privacy Practices and other representations.

121. Moreover, Plaintiffs and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

122. Defendants' disclosure of Plaintiff's and Class Members' Sensitive Information coupled with individually identifying information is highly offensive to the reasonable person.

123. As a result of Defendants' actions, Plaintiffs and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

124. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to compensatory and/or nominal damages.

125. Plaintiffs and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

126. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendants' actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

127. Plaintiffs also seek such other relief as the Court may deem just and proper.

**COUNT III**
**Negligence**
**(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Washington Subclass)**

128. Plaintiffs repeat and reallege the allegations contained in in paragraphs 1 through 127 as if fully set forth herein.

129. Through their use of the Website, Plaintiffs and Class Members provided Defendants with their Sensitive Information, believing such Information would be kept confidential.

130. By collecting and storing this data, Defendants had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

131. Defendants negligently failed to take reasonable steps to protect Plaintiff's and Class Members' Sensitive Information from being disclosed to third parties, without their consent, including to Google.

132. Defendants further negligently omitted to inform Plaintiffs and the Class that it would use their Sensitive Information for marketing purposes, and/or that their Sensitive Information would

be transmitted to third parties.

133. Defendants knew, or reasonably should have known, that Plaintiffs and the Class would not have provided their Sensitive Information to Defendants had they known that Defendants intended to use that Information for unlawful purposes.

134. Defendants' conduct has caused Plaintiffs and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Information accessed, stored, and disseminated without their knowledge or consent.

135. Plaintiffs and Class Members are entitled to compensatory, nominal, and/or punitive damages.

136. Defendants' negligent conduct is ongoing, in that it still holds the Sensitive Information of Plaintiffs and Class Members in an unsafe and unsecure manner. Therefore, Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

## COUNT IV
## Breach of Implied Contract
## (On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Washington Subclass)

137. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 136 as if fully set forth herein.

138. When Plaintiffs and Class Members provided their Sensitive Information to Defendants in exchange for medical products and services, they entered into an implied contract pursuant to which Defendants agreed to safeguard and not disclose the Sensitive Information without consent.

139. Plaintiffs and Class Members accepted Defendants' offers and provided their Sensitive Information to Defendants.

140. Plaintiffs and Class Members would not have entrusted Defendants with their Sensitive Information in the absence of an implied contract between them and Defendants obligating Defendants

to not disclose Sensitive Information without consent.

141. Defendants breached these implied contracts by disclosing Plaintiff's and Class Members' Sensitive Information to third parties like Google.

142. As a direct and proximate result of Defendants' breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein.

143. Plaintiffs and Class Members would not have used Defendants' services, or would have paid substantially less for those services, had they known their Sensitive Information would be disclosed.

144. Plaintiffs and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendants' breaches of implied contract.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Washington Subclass)**

145. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 144 as if fully set forth herein.

146. Plaintiffs plead this claim in the alternative to their breach of implied contract claim.

147. Plaintiffs and Class Members conferred a monetary benefit on Defendants in exchange for healthcare services. Specifically, they provided their Sensitive Information to Defendants which Defendants then utilized for marketing and advertising purposes, as described, *supra*.

148. Defendants knew that Plaintiffs and Class Members conferred a benefit upon them, which Defendants accepted. Defendants profited from the Sensitive Information of Plaintiffs and Class Members by exchanging it for marketing and advertising services.

149. In particular, Defendants enriched themselves by obtaining the inherent value of Plaintiff's and Class Members' Sensitive Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiff's and Class Members' Sensitive Information.

150. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize its own profits over the privacy of its customers' Sensitive Information.

151. Under the principles of equity and good conscience, Defendants should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiff's and Class Members' Sensitive Information.

152. If Plaintiffs and Class Members knew that Defendants had not reasonably secured their Sensitive Information, they would not have agreed to provide their Sensitive Information to Defendants.

153. Plaintiffs and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

154. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer injury.

155. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiffs and Class Members overpaid for Defendants' services.

## COUNT VI
## VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*
## Unauthorized Interception, Use, and Disclosure
## (On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Washington Subclass)

156. Plaintiffs repeat and reallege the allegations contained in the paragraphs 1 through 155 as if fully set forth herein.

157. The ECPA protects both sending and receipt of communications.

158. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

159. The transmissions of Plaintiff's Sensitive Information to the Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

160. Electronic Communications. The transmission of Sensitive Information between Plaintiffs and Class Members and the Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

161. Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

162. Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

163. Electronical, Mechanical or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiff's and Class Members' browsers;

b. Plaintiff's and Class Members' computing devices;

c. Defendants' web-servers; and

d. The Pixel code deployed by Defendants to effectuate the sending and acquisition of customer communications.

164. By utilizing and embedding the Pixels on the Website, Defendants intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

165. Specifically, Defendants intercepted Plaintiff's and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Private Information to third parties such as Google.

166. Defendants' intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding their Sensitive Information, including the reasons for their appointment, the dates of their appointment, and the location of their appointment.

167. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

168. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

169. <u>Unauthorized Purpose</u>. Defendants intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

170. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

171. Defendants are not a party to the communication based on its unauthorized duplication and transmission of communications with Plaintiffs and the Class. However, even assuming Defendants are a party, Defendants' simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Sensitive Information does not qualify for the party exemption.

172. Defendants' acquisition of sensitive communications that was used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a. Invasion of privacy;

b. Violations of the Washington Cannabis Patient Protection Act ("CPPA"), Wash. Rev. Code Ann. § 69.69.51, *et seq.*; and

c. Violations of the Washington My Health My Data Act ("MHMDA"), Wash. Rev. Code Ann. § 19.373.005, *et seq.*,

173. Defendants' conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiffs and Class Members, without user authorization; and disclosed individually identifiable Sensitive Information to Google without user authorization.

174. Defendants is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their Sensitive Information on the Website, because it used its participation in these communications to improperly share Plaintiff's and Class Members' Private Information with Google and other third-parties that did not participate in these communications, that Plaintiffs and Class Members did not

know were receiving their Sensitive Information, and that Plaintiffs and Class Members did not consent to receive their Sensitive Information.

175. As such, Defendants cannot viably claim any exception to ECPA liability.

176. Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendants' invasion of privacy in that:

a. Learning that Defendants have intruded upon, intercepted, transmitted, shared, and used their Sensitive Information for commercial purposes has caused Plaintiffs and Class Members to suffer emotional distress;

b. Defendants received substantial financial benefits from their use of Plaintiff's and Class Members' Sensitive Information without providing any value or benefit to Plaintiffs or Class Members;

c. Defendants received substantial, quantifiable value from their use of Plaintiff's and Class Members' Sensitive Information, such as understanding how people use the Website and determining what ads people see on the Website, without providing any value or benefit to Plaintiffs or Class Members;

d. Defendants failed to provide Plaintiffs and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Information; and

e. The diminution in value of Plaintiff's and Class Members' Sensitive Information and/or the loss of privacy due to Defendants making such Sensitive Information, which Plaintiffs and Class Members intended to remain private, no longer private.

177. Defendants intentionally used the wire or electronic communications to increase their profit margins. Defendants specifically used the Tracking Tools to track and utilize Plaintiff's and Class Members' Sensitive Information for financial gain.

178. Defendants were not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

179. Plaintiffs and Class Members did not authorize Defendants to acquire the content of their communications for purposes of invading their privacy via the Pixels.

180. Any purported consent that Defendants may claim they received from Plaintiffs and Class Members was not valid.

181. In sending and acquiring the content of Plaintiff's and Class Members' communications relating to their use of the Website, Defendants' purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

182. As a result of Defendants' violation of the ECPA, Plaintiffs and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT VII**
**VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT ("WCPA")**
**Wash. Rev. Code Ann. § 19.86.010, *et seq.***
**(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Washington Subclass)**

183. Plaintiffs repeat and reallege the allegations contained in the paragraphs 1 through 182 as if fully set forth herein.

184. The WCPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Wash. Rev. Code Ann. § 19.86.020. The Washington legislature has instructed that the WCPA should be "liberally construed that its beneficial purposes may be served." Wash. Rev. Code Ann. § 19.86.920.

185. Any violation of the Washington My Health My Data Act constitutes a violation of the WCPA. Wash. Rev. Code Ann. § 19.373.090. As Defendants violated the MHMDA, as set forth above, they are also liable under the WCPA.

186. Defendants additionally violated the WCPA by:

i. Falsely promising that it would keep confidential and not disclose Plaintiff's and Class Members' Sensitive Information;

ii. Failing to inform Plaintiffs and Class Members that it would provide their Sensitive Information to third parties in exchange for advertising and marketing services; and

iii. Surreptitiously collecting and sharing Plaintiff's and Class Members' Sensitive Information with third parties.

187. As a result of Defendants' violations of the WCPA, Plaintiff I.T. and Washington Subclass Members suffered injury, including the diminished economic value of their Sensitive Information, as explained, *supra*.

188. Defendants' violations of the WCPA were, and are, injurious to the public interest because:

i. Defendants have repeatedly collected and shared the Sensitive Information of thousands of individuals across, despite its representations to the contrary, and despite the vulnerable nature of its clientele; and

ii. Defendants will continue to collect and disclose the Sensitive Information of all users of its Website, absent court intervention.

189. As a result of Defendants' violations of the WCPA, Plaintiffs and Class Members are are entitled to all damages available under Wash. Rev. Code Ann. § 19.86.090. including actual damages, treble damages, equitable or declaratory relief, and attorney's fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and other Class Members, pray for judgment against Defendants as follows:

A. an Order certifying the Nationwide Class and Washington Subclass, and appointing the Plaintiffs and their Counsel to represent the Classes;

B. equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Information of Plaintiffs and Class Members;

C. injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

D. an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E. an award of attorney fees, costs, and litigation expenses, as allowed by law;

F. prejudgment interest on all amounts awarded and

G. all such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and other members of the proposed Classes, hereby demand a jury trial on all issues so triable.

Dated: January 30, 2026

Respectfully submitted,

*/s/ Sonjay C. Singh*
Sonjay C. Singh*
Tyler J. Bean*
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: tbean@sirillp.com
E: ssingh@sirillp.com

M. Anderson Berry (WSBA No. 63160)
**EMERY REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
916.823.6955 (Tel)
206.441.9711 (Fax)
*anderson@emeryreddy.com*

*pro hac vice admission forthcoming